IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION

| | |
|---|---|
| Banner Life Insurance Company, | Case No. 1:20 CV 36 |
| Plaintiff, | MEMORANDUM OPINION |
| -vs- | JUDGE JACK ZOUHARY |
| Talese L. Anderson, et al., | |
| Defendants. | |

## INTRODUCTION

Love, money, tragedy -- this case involves all three. Jeremy Eggers died unexpectedly in 2019. He left behind a $1 million life-insurance Policy. Jeremy's estate, which includes his four surviving children, represented by his son Jordan Eggers, made a claim for the proceeds. Jeremy's girlfriend, Defendant Talese Anderson, made a competing claim. Plaintiff Banner Life Insurance filed this Interpleader to resolve the dispute. Each side filed post-trial briefs (Docs. 74–75). This Court subsequently denied dueling Motions for Summary Judgment (Doc. 33), and held a bench trial to resolve factual disputes surrounding Jeremy's intended beneficiary.

## FACTS

Jeremy and his wife Monica divorced in September 2017. Jeremy met Talese in August 2018 and the two began dating (Doc. 73 at 57). By December, Jeremy had a tattoo commemorating the day they met (Talese would later get a matching one). Around Christmas, the two began planning to move in together (*id.* at 67). The couple discussed building a "modern industrial" house, with "three or four" bedrooms, on land Jeremy owned next to the home of his mother, Penny LaCrone (*id.* at 70). Talese gave Jeremy a check for $19,000 towards the construction (*id.* at 167).

Early the next year, the couple discussed listing Talese as the beneficiary on Jeremy's life-insurance Policy (*id.* at 85–88). Jeremy obtained the Policy in 2016, and his ex-wife was still listed as his beneficiary (Doc. 1 at 3). On February 3, 2019, Jeremy sent Talese a "Change Form," which he received from Banner to designate a new beneficiary (Doc. 73 at 87). He texted Talese: "Can [you] print these so I can send them off tomorrow" (Ex. 5 at 1297). Talese printed the form and filled out the first page, listing herself as the new beneficiary and her relationship to Jeremy as "girlfriend/soulmate" (Doc. 73 at 87).

According to Talese, Jeremy indicated he completed the second page and faxed the Change Form to Banner on February 19 (*id.*). But he didn't. In fact, on February 28, Jeremy completed the second page (signature sheet) of the Change Form in front of notary Matt Frye (*id.* at 39). Jeremy did not have the first page with him when he asked Frye to notarize the signature sheet. Frye notarized the page anyway, against notary best practices, which advise against notarizing incomplete documents.[1] According to Frye, Jeremy said he was unsure as to who the beneficiary would be (Doc. 73 at 39). During this meeting, Jeremy also showed Frye building plans for a "shop with living quarters" and three bedrooms, for which he was looking for financing (*id.* at 35–36).

Next, on March 26, Jeremy spoke with auto-insurance agent Amber Miller. During the meeting, Jeremy obtained car insurance for Talese's vehicle (*id.* at 281). Miller testified that Jeremy told her that he planned to name his mother Penny and his children as his life-insurance beneficiaries and asked about potentially increasing his Policy benefit (*id.* at 278). Miller walked him to Mark Johnson's office. Jeremy then asked Johnson, the agent who sold him the life-

---

[1] David Thun, *Notary Tip: How To Deal With Blank Spaces On Documents*, NAT'L NOTARY ASSOC. (Jan. 19, 2017), https://www.nationalnotary.org/notary-bulletin/blog/2017/01/notary-tip-deal-with-blank-spaces-documents.

insurance Policy, if he could increase his coverage from $1 million to $2 million (*id.* at 274). Johnson gave Jeremy the information to contact Banner directly (*id.*).

That weekend, on March 30, Penny left town to attend a family funeral (*id.* at 319). Jeremy stayed behind, planning to spend the weekend with Talese (*id.*). But Talese made other plans -- she boarded a private plane and flew to California, where she spent the weekend at the Waldorf Astoria hotel (*id.* at 196). The trip was paid for by another man, who had reached out to Talese and asked if she "want[ed] to come and bring some girls" (*id.* at 195). According to Penny, Talese's all-expenses-paid vacation left Jeremy "absolutely brokenhearted" (*id.* at 319). Soon after, Jeremy called his lifelong best friend, Toby Bounce, who testified that Jeremy was "crying, devastated, and broken" about Talese's trip (*id.* at 313).

Days after the California trip, on April 5, Banner Life received two documents -- the Change Form and an application for a new $900,000 Accidental Death Policy (Doc. 62 at 16). Page one of the Change Form listed Talese, Jeremy's "soulmate," as the beneficiary. The second page was the signature sheet notarized by Frye. However, there were problems with the Change Form -- Jeremy's name, policy number, and date of signature were missing on the first page (*id.*). The handwriting on the pages clearly differed. And the fact that the second page was notarized five weeks prior to mailing the Change Form was also a "red flag," according to Banner (*id.* at 16). So, on April 9, Banner responded by sending Jeremy a "Missing Information Letter," asking him to complete the Change Form and send it back in order to effectuate the beneficiary change (*id.* at 14). The Letter included a copy of the incomplete Change Form, instructions to fill in the missing information, and a prepaid envelope to mail the completed form back to Banner (*id.* at 17).

Jeremy never completed the Form. On May 18, Jeremy's body was found trapped under a skid-steer loader at the bottom of a pond on the property of his boss, Kevin O'Neil (Doc. 73 at 112). The following morning, Talese went to Kevin's property and accessed Jeremy's truck. She

removed some of his belongings and left with the keys, which Jeremy had left in the truck (*id.* at 99). She later asked Kevin for permission to access the truck, and if she could park the truck at her house until the "insurance bullshit" was over (*id.* at 147). Kevin said no. Two days later, On May 21, Talese called Banner about the insurance money and was told Jeremy's Policy was under review (Ex. 1 at 1).

The following day, police interviewed Talese. During that interview, she told police that Kevin gave her permission to access the truck when she called him at 12:40 PM on May 19 (Doc. 73 at 144). However, a friend who accompanied Talese to Kevin's property told officers that they accessed the truck early that morning -- well before the phone call (*id.* at 138–39). Talese also told police that she locked the truck because she did not want Jeremy's family "searching through it" (Doc. 71-1 at 1). Talese thought his life-insurance Policy was in his truck, but for some reason opted not to look for it. "And there's a good chance his life insurance policy is in his truck . . . But I didn't look for it. So I don't know. I don't know if it's in there" (*id.*). When officers asked about Jeremy's beneficiary, Talese wasn't sure (*id.* at 2):

> Jeremy and I actually did discuss that and he made a comment like, "I want to put you on my life insurance," but I don't know what that entails. He did have me sign papers that he said he was going to fax them, but I don't know what that was. And I don't have the fax papers. I just thought it was a sweet gesture.

She also alleged that Jeremy had a dream that he was drowning just three weeks prior, which may have been another reason for him to get his affairs in order (*id.*).

On June 3, some two weeks after Jeremy's death, Talese called Banner yet again. This time, contrary to her recorded police interview, she insisted that she "knew for a fact" that Jeremy faxed the Change Form to Banner (Doc. 73 at 113–14). But Banner had already determined that Jeremy's ex-wife Monica was the beneficiary of Jeremy's life-insurance Policy at the time of his death (Ex. 1 at 2), meaning that, under Idaho's automatic-divorce-revocation statute, the insurance benefit

4

would go to Jeremy's estate. *See* Idaho Code § 15-2-804. A Banner employee told Talese that the Change Form was incomplete and, because she was not the beneficiary, Banner could not provide her further information (Ex. 1 at 2).

Undeterred, Talese immediately hired an attorney, who sent Banner a letter disputing the designation of Jeremy's estate as the beneficiary (*id.* at 3). On June 6, Talese sent a complaint to the Idaho Department of Insurance, asserting that she "knew firsthand" that Jeremy had sent the Change Form in February (Doc. 73 at 133). No satisfaction there. This lawsuit followed.

## Discussion

With an Interpleader, each defendant bears the burden of establishing entitlement to the disputed insurance proceeds by a preponderance of the evidence. Jordan must show, by a preponderance of the evidence, that the Policy was in effect and that the estate remains the rightful beneficiary. Talese must show that Jeremy substantially complied with Banner's change-of-beneficiary provisions.

Generally, "[w]here the policy, as a matter of contract, specifies the method of changing beneficiaries, [] a change of beneficiary can be accomplished only in the manner pointed out in the policy." *Noyes v. Noyes*, 106 Idaho 352, 356 (Ct. App. 1984). Any attempt to change a beneficiary that does not comply with a policy's terms is ineffective. *Id.* However, "a change of beneficiary can be effected without complete compliance with the provisions of the policy" so long as the insured "substantially compli[ed]." *IDS Life Ins. Co. v. Est. of Groshong*, 112 Idaho 847, 849 (1987). To demonstrate Jeremy "substantially complied" with Banner's change-of-beneficiary provisions, Talese must prove, by a preponderance of the evidence, that: (1) Jeremy intended to change his beneficiary, and (2) he attempted to do so to "the best of his abilities." *Id.*

5

*Intent*

With respect to an insured's intent, this Court looks to: "(1) the completeness to which the forms were filled out, (2) testimony of witnesses which established the insured intended to make a change of beneficiary, and (3) the length of time between completing and signing the change form and forwarding it to the insurance company." *Prudential Ins. Co. of Am. v. Cooper*, 666 F. Supp. 190, 192 (D. Idaho 1987), *aff'd*, 859 F.2d 154 (9th Cir. 1988). So, what did this Court learn at trial?

Prong one weighs in Jordan's favor. As this Court outlined at Summary Judgment (Doc. 33 at 3), all that we have in this case is a partially completed Change Form, mailed to Banner Life by an unknown individual, likely after Talese returned from the California trip. That form lacked Jeremy's name and policy number, which is peculiar considering Jeremy paid the Policy premium for years and always included his name, policy number, and date when corresponding with Banner (*see* Doc. 31-2 at 23–30). The designation of Talese as the beneficiary was not in Jeremy's handwriting. And although his signature was notarized, Matt Frye testified he never saw page one when Jeremy brought him the separate signature page (Doc. 73 at 38). In short, the Change Form was incomplete.

The second prong, witness testimony, is critical in this case. First, let's examine Talese's version of events. According to her, the couple's relationship was "dreamy," and they were in a "good place" with no unresolved issues, right up until Jeremy's sudden death (*id.* at 56–57). She dismissed the effect of her California trip on their relationship, testifying that Jeremy was only upset that he could not attend due to his work schedule (*id.* at 206). She also testified that their plans to construct a house and live together were unchanged, and that they opted to build a "shop house" only because they could not get the required permits to build a full-sized house as planned (*id.* at 191). But, even so, this pole-barn structure allegedly was still intended to be their "modern industrial shop home" (*id.* at 230). Both points are refuted by multiple witnesses.

The contractor, Rick Adams, testified that the plans to construct a house had completely changed before Jeremy's death. Rather than a "contemporary" house on land he owned, Jeremy opted for the "shell" of a pole barn, on land owned by Penny (*id.* at 257). Jeremy also changed the design, from the originally planned gable roof to a lower-clearance "shed" roof (*id.* at 251). The change cut the space for any potential living quarters in half (*id.*). The remaining space was too small for the couple and Talese's three children, and undoubtedly not the modern dream home that Talese described. According to Rick, Jeremy changed the plans because his relationship with Talese at the time was "hot and cold" (*id.* at 301).

More importantly -- the California trip. Penny, Jeremy's mother, and Toby, his best friend, both credibly testified, in great detail, about the distress the California trip caused Jeremy, and about how Jeremy was "unsure" of the future of the relationship (*id.* at 313, 319). *See Banner Life Ins. v. Mark Wallace Dixson Irrevocable Tr.*, 147 Idaho 117, 130 (2009) (noting that courts "give[] weight to the testimony of witnesses which establish that the insured intended to make a change of beneficiary") (citation omitted). At trial, Talese admitted Jeremy was upset, but claimed it was only because he could not attend due to work obligations (Doc. 73 at 206). But Kevin, Jeremy's boss and close friend, testified he would never deny a request for Jeremy to take a vacation: "Jeremy is one of my best friends. If he wanted to go do something, I never stood in his way" (*id.* at 264). Another piece of Talese's story that simply doesn't add up.

Apart from the conflicting testimony of several witnesses, Talese's credibility is further called into question by her actions immediately following Jeremy's death -- and her explanation for those actions. Her account of when and why she accessed Jeremy's truck shifted multiple times. First, she told officers she received permission from Kevin, at 12:40 PM on May 19 (*id.* at 144). But that cannot be correct because, as her friend confirmed, Talese visited the truck earlier that morning (*id.* at 145). When confronted with this timeline issue at trial, Talese changed her story, claiming that

7

Kevin gave her permission on May 18, the day Jeremy's body was found (*id.* at 149). But Kevin credibly recounted how distraught he was after finding his lifeless friend, and noted that "a conversation about a key to a truck . . . would have been so out of place in that situation" that he would have surely remembered if she had asked him (*id.* at 269). Similarly, Talese testified that Penny gave her permission to take Jeremy's cell phone on June 15 (*id.* at 208). She deleted several items and sent numerous "screen shots" to herself and a friend (*id.* at 213–15). Talese claimed it was Penny who "advised [her] to remove . . . intimate stuff" from the phone (*id.* at 210). But Penny outright denied giving Talese the phone or advising her to delete any of its contents (*id.* at 304).

Finally, this Court looks to the length of time between the execution of the Change Form and the mailing to Banner. According to Talese, she printed and completed the form as directed in early February, and Jeremy then "faxed" it back to Banner on February 19. But Jeremy did not fax the form to Banner. In fact, he did not even have the signature page notarized until February 28. Matt Frye credibly testified that Jeremy told him on February 28 that he had not yet "made a decision" about who his beneficiary would be (*id.* at 39). Taking Talese at her word, the most likely explanation is that Jeremy told her that he sent the Change Form but, in reality, he did not. Banner representatives flagged the Change form as "suspicious" due in part to the fact that it was not received until five weeks after being notarized (Doc. 62 at 16). Yes, suspicious. And what record evidence explains the five-week delay? Amber Miller credibly testified that Jeremy told her on March 26 that he wished to designate Penny and his children as his beneficiaries (Doc. 73 at 282). Miller's testimony is corroborated by Jeremy's close friend Chris Hampton. According to Hampton, the week before his death, Jeremy stated that his relationship with Talese "wasn't the same from when they originally had started dating" and that he wished to mend his relationship with his children (*id.* at 295–96).

Did Jeremy, at one point in early February, intend to make Talese his beneficiary?  Maybe.  However, the weight of the trial evidence indicates that any such intent was abandoned prior to his death.  *See, e.g.*, *Jackson Nat'l Life Ins. v. Pagan*, 2021 WL 423737, at *3 (D. Conn. 2021) ("The Court finds that the weight of the trial evidence shows that [the insured] abandoned his intention to change the beneficiaries [to his current wife and other daughter].  Although [the insured] may have once demonstrated changed intent, he did not do all that was in his power to make the change effective.").  *See also Allen v. Abrahamson*, 12 Wash. App. 103, 106 (Ct. App. 1974) ("There is virtually no persuasive authority to support [an] argument that a change in beneficiary is effective when only the insured's intent at one time to make that change is proven.").  This conclusion is further supported by this final fact: at the time of his death, Jeremy possessed a second Change Form, with a properly completed first page identifying Penny as his beneficiary (Doc. 31-4 at 8).

### *Best of His Abilities*

Next, even if Talese could demonstrate that Jeremy manifested the intent to designate her as his beneficiary at the time of his death, she must also show that he "had done everything to the best of his ability to effect the change."  *Groshong*, 112 Idaho at 850.  Talese argues that the defective Change Form satisfies this prong, and even though it was incomplete, Jeremy merely died before having the opportunity to resubmit a corrected form.  "[E]ven if [Jeremy] did have the [Change Form] in his possession at his death, he simply did not have the opportunity to return the form before his death" (Doc. 75 at 11).

Two problems with this scenario.  First, the defective Change Form.  As stated previously, Jeremy's handwriting appears only on the second page of the form.  He did not include his name or policy number on the Form, which he did routinely and repeatedly in the past (*see* Doc. 31-2 at 23–30).  By Banner's own Policy language, that Form was insufficient to affect a beneficiary change.  And then there is no evidence that an "infirmity prevented [Jeremy] from understanding or complying with

9

the [P]olicy requirements for changing his beneficiary." *Prudential Ins. Co. of Am. v. Withers*, 1997 WL 6611511, at *1 (9th Cir. 1997).

The second problem for Talese is the Missing Information Letter. Banner mailed Jeremy a Letter informing him that the beneficiary change was ineffective, on April 9, 2019 -- more than five weeks prior to his death (Doc. 62 at 14). A Banner representative testified the Letter was sent to Penny's address, the same address Banner always used to send documents to Jeremy (*id.*). This evidence raises a presumption that Jeremy received the Letter. "The mailbox rule provides that the proper and timely mailing of a document raises a rebuttable presumption that the document has been received by the addressee in the usual time." *Schikore v. BankAmerica Supplemental Ret. Plan*, 269 F.3d 956, 961 (9th Cir. 2001). *See also In re Idaho Mut. Ben. Ass'n*, 56 Idaho 272 (1936) ("The rule is well settled that, if a letter is properly mailed, it is presumed that it reached the party to whom it was addressed and was received by him in the due course of mail.") (citations omitted). Talese argues the mailbox rule is rebutted by testimony that Jeremy "let mail pile up" and "was very unorganized" (Doc. 75 at 10). This Court finds that evidence is insufficient to rebut the fact that Jeremy received the Missing Information Letter, mailed to the address on file with Banner (Docs. 31-2 at 23–30; 62 at 14). *See, e.g.*, *Aetna Life Ins. v. Montgomery*, 286 F. Supp. 2d 832, 839 (E.D. Mich. 2003) ("Merely stating that the document is not in the addressee's files or records . . . is insufficient to defeat the presumption of receipt.").

Jeremy never completed the change-of-beneficiary process, an easy task. And "[t]he record is void of any evidence or suggestion that [he] was precluded or impaired in any way from sending the form to the company had [he] chosen to do so." *Snider v. Valley Forge Life Ins.*, 2007 WL 9724935, at *2 (D. Mont. 2007). Why not? Likely because he chose not to.

## CONCLUSION

Several questions may forever remain unanswered. Certainly, how Jeremy died is one such question. Was it Jeremy who sent the defective Change Form in the first place? Why was Talese

insistent on getting into Jeremy's truck?  However, one thing is certain.  The evidence at trial made clear that paperwork to change Jeremy's beneficiary was incomplete; Talese did not credibly establish either that Jeremy wished to designate her as his beneficiary at the time of his death, or that he did everything to the best of his abilities to effectuate such a change.

The Change Form was ineffective under both Banner's terms, and the substantial-compliance doctrine.  Under Idaho law, Jeremy's estate is the proper beneficiary of the Policy proceeds.  The Clerk of Court shall remit payment as directed in the accompanying Order of Disbursement (Doc. 78).

IT IS SO ORDERED.

                                                          s/ *Jack Zouhary*
                                                   JACK ZOUHARY
                                                   U. S. DISTRICT JUDGE

                                                   December 27, 2021